# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
### LAKE CHARLES DIVISION

| | |
|---|---|
| **KATELYN DICKSON** | **CASE NO.  2:24-CV-00121** |
| **VERSUS** | **JUDGE JAMES D. CAIN, JR.** |
| **DEXCOM INC** | **MAGISTRATE JUDGE LEBLANC** |

## MEMORANDUM RULING

Before the court is a Motion to Compel Arbitration or, alternatively, Motion to Dismiss [doc. 19] filed by defendant Dexcom Inc. Plaintiff Katelyn Dickson opposes the motions. Doc. 22.

## I.
## BACKGROUND

This products liability suit arises from plaintiff's use of the Dexcom G6 System, a device designed to detect and alert the user of dangerous blood glucose levels. The G6 replaces traditional fingerstick monitoring for diabetic patients with a quarter-sized skin patch that continuously measures and monitors glucose levels. *See* doc. 16, att. 1 (FDA news release). Plaintiff alleges that she was injured while using the G6 because it failed to alert her to dangerously low blood glucose levels, and that this hypoglycemic event led her to crash her car. Defendant maintains that plaintiff's claims are subject to an arbitration clause. Alternatively, it asserts that she fails to state a claim for which relief can be granted.

## A.  G6 Background

Dexcom submitted a de novo classification request[1] for the G6 to the FDA, requesting approval under the Medical Device Amendments to the Food, Drug, and Cosmetics Act ("FDCA"), codified at 21 U.S.C. § 360k(a). Doc. 16, ¶ 27; doc. 16, att. 1. In March 2018 the FDA approved the request and allowed G6 to enter the market as a Class II medical device, subject to certain mitigation measures for its identified risks. *Id.*; *see* 87 Fed. Reg. 9237. Dexcom then marketed the device in a multi-pronged campaign, including websites, social media, and promotions targeted at health care providers. Doc. 16, att. 3, ¶ 45; doc. 16, atts. 7–15.

## B.  G6 App Arbitration Clause

The G6 consists of three main components: a sensor, a transmitter, and a display device. Doc. 19, att. 2, ¶ 4. The user can view glucose data on her display device by using either a Dexcom receiver or the G6 App, a mobile medical phone application that allows the user to view data on a compatible personal mobile device such as an iPhone. *Id.* Upon initial launch, the G6 app displays a series of startup screens known as the "Setup Wizard" to have the user configure the device. *Id.* at ¶ 9. The Setup Wizard requires the user to log in to a Dexcom account to use the app. At this step the user must agree to Dexcom's "Terms of Use," which are hyperlinked to a set of legal agreements that display in a web view.[2]

---

[1] The de novo classification request "provides a pathway for certain new types of devices to obtain marketing authorization as class I or class II devices." Doc. 16, att. 2, p. 3. It is a risk-based classification process designed for devices entering the market with no substantial equivalent. *Id.*

[2] If the user does not already have a Dexcom account, she is required to create a new one by entering her email address and checking a box that indicates "you agree that your use of any Dexcom, Inc. website, mobile applications or other software is subject to the Dexcom Terms of Use and Privacy Policy applicable for your country." *Id.* Both "Terms of Use" and "Privacy Policy" are hyperlinked to sets of legal agreements that the user can display from the web. *Id.* The

The Terms of Use in effect since February 25, 2021, contain the following language

at the top of the second page:

> PLEASE NOTE THAT THIS AGREEMENT CONTAINS A MANDATORY ARBITRATION OF DISPUTES PROVISION THAT REQUIRES THE USE OF ARBITRATION ON AN INDIVIDUAL BASIS TO RESOLVE DISPUTES RATHER THAN JURY TRIALS OR CLASS ACTIONS, TO THE EXTENT PERMITTED BY APPLICABLE LAW.

*Id.* at ¶ 7 & p. 6. Further down, it includes the following arbitration clause:

> **7. Disputes and Governing Law**
> **7.1 How are disputes resolved under this agreement?**
> TO THE EXTENT PERMITTED BY APPLICABLE LAW, AND SUBEJCT TO THE COUNTRY-SPECIFIC PROVISIONS BELOW, EXCEPT FOR DISPUTES THAT QUALIFY FOR SMALL CLAIMS COURT, ALL DISPUTES ARISING OUT OF OR RELATED TO THIS AGREEMENT OR ANY ASPECT OF THE RELATIONSHIP BETWEEN YOU AND DEXCOM, WHETHER BASED IN CONTRACT, TORT, STATUTE, FRAUD, MISREPRESENTATION OR ANY OTHER LEGAL THEORY (EACH, A "DISPUTE'), WILL BE RESOLVED THROUGH FINAL AND ARBITRATION BEFORE A NEUTRAL ARBITRATOR INSTEAD OF IN A COURT BY A JUDGE OR JURY, AND YOU AGREE THAT DEXCOM AND YOU ARE EACH WAIVING THE RIGHT TO TRIAL BY A JURY. YOU AGREE THAT ANY ARBITRATION UNDER THIS AGREEMENT WILL TAKE PLACE ON AN INDIVIDUAL BASIS. YOU FURTHER AGREE THAT CLASS ARBITRATIONS AND CLASS ACTIONS ARE NOT PERMITTED, AND THAT YOU ARE AGREEING TO GIVE UP THE ABILITY TO PARTICIPATE IN A CLASS ACTION. THE ARBITRATION WILL BE ADMINISTERED BY THE AMERICAN ARBITRATION ASSOCIATION ("AAA") UNDER ITS CONSUMER ARBITRATION RULES . . . . NOTWITHSTANDING ANY OF THE FOREGOING, NOTHING IN THIS AGREEMENT WILL PRECLUDE YOU FROM BRINGING ISSUES TO THE ATTENTION OF FEDERAL, STATE OR LOCAL AGENCIES AND, IF THE LAW ALLOWS, THEY CAN SEEK RELIEF AGAINST US FOR YOU.

---

user cannot proceed to the next step in the Setup Wizard until she checks the box accepting Dexcom's Terms of Use and Privacy Policy. *Id.*

 If a user has an account but has not previously accepted the Terms of Use, the Setup Wizard displays a screen titled "Legal." That screen contains the phrase "I agree to Terms of Use," with "Terms of Use" hyperlinked to the same legal agreements. The user must check the box indicating her agreement to proceed. *Id.* at ¶ 10. For both the new user and existing user options, the boxes next to the Terms of Use agreement are initially empty and must be affirmatively checked. *Id.* at ¶¶ 9, 10.

*Id.* at ¶ 7 & pp. 14–15. As part of the G6 App setup process, plaintiff agreed to the Dexcom Terms of Use on December 9, 2021. Doc. 16, ¶¶ 78, 80, 96; *see* doc. 19, att. 2, ¶ 14.

### C.  Plaintiff's Use of the G6

Plaintiff, a 29-year-old woman diagnosed with Type 1 diabetes mellitus, began using another glucose monitoring device, the FreeStyle Libre CGM, in January 2019 on the prescription of her physician. Doc. 16, ¶¶ 13, 63–64. At that time her diabetes was well managed. *Id.* at ¶¶ 62–64. She switched back to fingerstick monitoring from March 2020 to October 2021, after losing her insurance. *Id.* at ¶ 65. In October 2021, when plaintiff was approximately six weeks pregnant, she resumed use of the FreeStyle Libre GCM on the advice of her physician. *Id.* at ¶ 66. The FreeStyle Libre GCM is approved for use during pregnancy. Doc. 16, att. 20.  In December 2021, on the advice of her physician and while pregnant, plaintiff switched to the G6. Doc. 16, ¶ 68.

The G6 User Guide advises:

- **Don't Use If . . .**

   Do not use the G6 if you are pregnant, on dialysis, or critically ill. It is not
   known how different conditions or medications common to these populations
   may affect performance of the system. G6 readings may be inaccurate in
   these populations.

Doc. 16, att. 6, p. 24. Plaintiff's physician received over $145,000.00 in compensation from Dexcom, maker of the G6, between 2019 and 2022.[3] *Id.* at ¶ 51.

---

[3] The figure is $145,415.61, derived from entries for plaintiff's physician on the Open Payments database. The database is a program of the Centers for Medicare & Medicaid Services, which collects and publishes information about the financial relationship between health care providers and certain drug and medical device companies. *See* Open Payments, *available at* https://openpaymentsdata.cms.gov/.

Plaintiff was still using the G6 on October 27, 2022, when she alleges that she became involved in a motor vehicle accident after her blood glucose levels suddenly dropped to dangerously low levels. *Id.* at ¶ 103. Specifically, she states that she struck a concrete driveway and culvert at 65 miles per hour, causing her airbags to deploy and trapping her in her vehicle. *Id.* At that time plaintiff was between twelve and fourteen weeks pregnant and traveling with a small infant in her car. *Id.* She further alleges that emergency responders recorded her blood glucose as 53 mg/dl, which the CDC defines as severely low.[4] *Id.* at ¶ 107.

### D. Plaintiff's Suit

Plaintiff filed suit in this court on January 30, 2024. Doc. 1. In her First Amended Complaint, she raises state law claims for design defect, failure to warn, and breach of express warranty under the Louisiana Products Liability Act ("LPLA"), as well as redhibition, rescission due to error, and rescission due to fraud. Doc. 16. She also seeks punitive damages. *Id.* Defendant now moves to compel arbitration of all claims under the above-described arbitration clause in the Dexcom Terms of Use. Doc. 19. Alternatively, it moves to dismiss plaintiff's claims under Federal Rule of Civil Procedure 12(b)(6) on the following grounds:

1. Plaintiff's claims are preempted by federal law

2. Plaintiff's claims are deficiently pled or barred by Louisiana law

3. Plaintiff's allegations establish that she was misusing her G6

---

[4] According to the CDC, low blood sugar is defined as below 70 mg/dl and severe low blood sugar is below 54 mg/dl. *See* Treatment of Low Blood Sugar (Hypoglycemia), https://www.cdc.gov/diabetes/treatment/treatment-low-blood-sugar-hypoglycemia.html (last visited June 10, 2024).

4.  Plaintiff's punitive damages claim is precluded by Louisiana law

*Id.* Plaintiff opposes both motions. Doc. 22.

## II.
## Law & Analysis

### A.  Motion to Compel Arbitration

The Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 *et seq.*, controls the validity and enforcement of arbitration agreements. *Walton v. Rose Mobile Homes, LLC*, 298 F.3d 470, 473 (5th Cir. 2002). Under this law, agreements to arbitrate are enforceable except under grounds that exist "at law or in equity for revocation of any contract." 9 U.S.C. § 2. A party aggrieved by the other's alleged failure to honor an arbitration agreement may petition the district court for enforcement of the agreement. *Id.* at § 4. The court's review involves two steps: deciding (1) "whether the parties entered into *any arbitration agreement at all*" and then (2) whether the claim at issue is covered by the agreement. *Kubala v. Supreme Prod. Servs., Inc.*, 830 F.3d 199, 201 (5th Cir. 2016) (emphasis in original).

At the first step, the court ordinarily applies state law to determine if a contract exists. *Will-Drill Res. Inc. v. Samson Res. Co.*, 352 F.3d 211, 218 (5th Cir. 2003). Under Louisiana law, a contract is formed by the consent of the parties as established through the offer and acceptance. La. Civ. Code art. 1927. The offer and acceptance may be made orally, in writing, or by action or inaction "clearly indicative of consent." *Id.* Plaintiff abandons her redhibition and rescission claims as a basis for avoiding arbitration and instead argues that she could not have consented to arbitrate because she lacked reasonable notice of the existence of the arbitration clause.

The contract at issue is a "clickwrap" agreement, in which "a user must click 'I agree,' but not necessarily view the contract to which she is assenting." *Berkson v. Gogo LLC*, 97 F.Supp.3d 359, 394–95 (E.D.N.Y. 2015). "[C]ourts scrutinize the circumstances surrounding an alleged asset to a clickwrap agreement" but have generally found them enforceable because "by requiring a physical manifestation of assent, a user is said to be put on inquiry notice of the terms it assented to." *Applebaum v. Lyft, Inc.*, 263 F.Supp.3d 454, 465 (S.D.N.Y. 2017) (quoting *Berkson*, 97 F.Supp.3d at 397) (cleaned up); *see Deshotel v. Paypal, Inc.*, 2020 WL 5813322, at *7 (W.D. La. Aug. 24, 2020) (collecting cases). Nevertheless, the court should give careful attention to the presentation of the agreement, including the clarity and conspicuousness of the arbitration terms and whether the user had sufficient notice of the additional terms. *Applebaum*, 263 F.Supp.3d at 465 (citing *Nicosia v. Amazon, Inc.*, 834 F.3d 220, 233 (2d Cir. 2016)); *see also Norcia v. Samsung Telecomms. Am., LLC*, 845 F.3d 1279, 1285 (9th Cir. 2017) ("[A]n offeree . . . is not bound by inconspicuous contractual provisions of which he was unaware.").

Plaintiff argues that the "Legal" screen is confusing and that the "exact" interface was recently rejected for lack of sufficient notice by a California appellate court. In that matter, *Herzog v. Superior Court of San Diego County*, 101 Cal. App. 5th 1280 (Cal. 4th Dist. Ct. App. May 16, 2024), the Court of Appeals held that users interacting with the clickwrap agreement in the G6 App

> would have no reason to believe, given the context of the transaction and the content of the text on the 'Legal' screen, that by clicking the checkbox next to 'I agree to the Terms of Use' they were entering an agreement that concerned any matters other than the scope of the user's privacy waiver and management of the user's personal information.

*Id.* at 1298. But the interface in *Herzog* differs in key respects from the Setup Wizard employed here. In *Herzog*, the "Legal" screen contained the following text next to the check box:

> You understand and agree that your use of this website or any DexCom Inc. mobile application or software platform for your DexCom continuous glucose monitor is subject to the Terms of Use, Privacy Policy and any other acknowledgements listed below. *By ticking the boxes below you understand that your personal information, including your sensitive health information, will be collected, used and shared consistently with the Privacy Policy and Terms of Use. You further understand that personal information and sensitive personal information will be stored and processed by DexCom, Inc., and/or its affiliate, SweetSpot Diabetes Care, Inc. in the United States, which may have different data protection laws than the country in which you reside.*

*Id.* at 1297 (italics added). Here, the "Legal" screen displays as follow:



Doc. 24. The user can only proceed, as described above, if she has checked the box. The text next to the box indicates that her "use of any Dexcom, Inc. website, mobile applications, or other software" is subject to the Terms of Use, which include an arbitration clause. But this language only indicates that the user is consenting to arbitration for claims arising from her use of the app. It does not advise her that use of the G6 device, which does

not require the app, is also subject to the Dexcom Terms of Use. "[T]he onus must be on website owners to put users on notice of the terms to which they wish to bind consumers." *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1179 (9th Cir. 2014). As in *Herzog*, the legal screen used in the Setup Wizard here fails to provide a reasonable user with notice that she is waiving her right to pursue any claims arising from a medical device merely by installing the associated app. Accordingly, the Motion to Compel Arbitration will be denied.

## B. Motion to Dismiss

### 1. Legal Standard

Rule 12(b)(6) allows for dismissal when a plaintiff "fail[s] to state a claim upon which relief can be granted." When reviewing such a motion, the court should focus on the complaint and its attachments. *Wilson v. Birnberg*, 667 F.3d 591, 595 (5th Cir. 2012). The Court can also consider documents referenced in and central to a party's claims only if plaintiffs do not object. *Scanlan v. Texas A&M Univ.*, 343 F.3d 533, 536 (5th Cir. 2003). Courts "may also consider matters of which [it] may take judicial notice." *Hall v. Hodgkins*, 305 Fed. App'x 224, 227 (5th Cir. 2008) (internal citation omitted) (quoting *Lovelace v. Software Spectrum Inc.*, 78 F.3d 1015, 1017–18 (5th Cir.1996) (unpublished opinion)).

Such motions are reviewed with the court "accepting all well-pleaded facts as true and viewing those facts in the light most favorable to the plaintiff." *Bustos v. Martini Club, Inc.*, 599 F.3d 458, 461 (5th Cir. 2010). However, "the plaintiff must plead enough facts 'to state a claim to relief that is plausible on its face.'" *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570

(2007)). Accordingly, the court's task is not to evaluate the plaintiff's likelihood of success but instead to determine whether the claim is both legally cognizable and plausible. *Lone Star Fund v. (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010).

### 2. Rescission and redhibition claims

Plaintiff has brought state law claims under both the LPLA and on theories of redhibition and rescission. The latter, however, appear asserted solely as a means of avoiding the arbitration clause *supra*. The LPLA establishes "exclusive theories of liability for manufacturers for damage caused by their products" under Louisiana law. La. R.S. § 9:2800.52. The LPLA does not preclude damages for breach of contract, including for claims based on fraud. *C-Innovation, LLC v. Norddeutsche Seekabelewerke GmbH*, 2013 WL 990026, at *5 (E.D. La. Mar. 13, 2013). Additionally, the LPLA precludes a redhibition claim except to the extent plaintiff seeks rescission of the sale, reduction of the purchase price, or economic losses. *See Alexander v. GlaxoSmithKline LLC*, 2015 WL 5440994, at *5 (E.D. La. Sept. 14, 2015). The plaintiff has alleged no damages other than those sought under her LPLA claims. Additionally, the court has already found that the arbitration clause did not bind plaintiff. Accordingly, the redhibition and rescission claims will be dismissed.

### 3. Preemption of LPLA and Redhibition

Defendant also argues that the case should be dismissed because plaintiff's claims are preempted by the Medical Device Amendments ("MDA") to the FDCA, codified at 21 U.S.C. § 360. The MDA preempts state law claims when: (1) the federal government has established specific requirements applicable to the device and (2) the claims are based on

state requirements that are "different from, or in addition to the federal ones" and relate to the device's safety and efficacy. *Riegel v. Medtronic, Inc.*, 552 U.S. 312, 322 (2008).

The government argues that the first prong is met because the FDA has established "special controls" for the design, testing, manufacture, and labeling of the G6. Specifically, the FDA identified risks associated with the G6 and issued requirements for the design, manufacturing, and labeling of the device to offset the risks as part of its Class II approval. 87 Fed. Reg. at 9238. But plaintiff maintains that devices cleared under the Class II de novo pathway are not subject to express preemption.

Under the MDA, Class III devices pose the greatest risks and receive the most federal oversight. *Riegel*, 552 U.S. at 316–17. These devices undergo a rigorous premarket approval addressing their design, labeling, and manufacturing. *Id.* Class I devices pose "no unreasonable risk of illness or injury" and are subject to only minimal regulation by "general controls." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 476–77 (1996). In the middle ground, Class II devices are potentially more harmful. *Id.* at 477. Class II devices with no substantial equivalent, such as the G6, are reviewed under a heightened "de novo" standard and subject to "special controls" published by the FDA to offset their identified risks.

Recently, the Northern District of Georgia considered whether the FDA's approval of the G6 preempted state law claims. *Tuttle v. Dexcom, Inc.*, 2021 WL 8998920 (N.D. Ga. May 20, 2021). It emphasized that the Supreme Court had never held that only premarket approval for Class III devices meets the preemption requirements, and that lower courts considering other pathways "have held that they, like premarket approval, imposed requirements on medical devices." *Id.* at *6; *see, e.g.*, *Papike Tambrands Inc.*, 107 F.3d

737, 741 (9th Cir. 1997) ("Preemption results in this case because the FDA has established specific counterpart regulations with respect to labeling tampons." (citing 21 C.F.R. § 808.1(d)); *Kelsey v. Alcon Labs, Inc.*, 2019 WL 1884225, at \*10–\*11 (D. Utah Apr. 22, 2019) (guidance regarding labeling of contact lenses in a § 510(k) substantial equivalent application imposed "requirements"). In contrast, the court held that the "requirements" imposed through substantial equivalent review in *Thompson v. DePuy Orthopaedics, Inc*., had no preemptive effect because they were only intended as suggestions or guidance and did not "mandate any particular language or warning." 2015 WL 7888387, at \*9–\*10 (S.D. Ohio Dec. 4, 2015). Likewise, in *Tuttle* the court could not say whether plaintiffs' claims against Dexcom were preempted because the regulations for the G6 had not yet been codified. 2021 WL 8998920 at \*6.

Now, however, the relevant requirements have been codified in the Federal Register:

Table 1—Integrated Continuous Glucose Monitoring System Risks and Mitigation Measures

| Identified risks | Mitigation measures |
|---|---|
| Clinical action based on falsely high or falsely low inaccurate glucose values or inaccurate alerts may lead to inappropriate treatment decisions | General Controls and special controls (1) (21 CFR 862.1355(b)(1)), (2) (21 CFR 862.1355(b)(2)), (3) (21 CFR 862.1355(b)(3)), (4) (21 CFR 862.1355(b)(4)), (5) (21 CFR 862.1355(b)(5)), (6) (21 CFR 862.1355(b)(6)), and (7) (21 CFR 862.1355(b)(7)). |
| Clinical action in pediatric patients based on falsely high or falsely low inaccurate values or inaccurate alerts due to poorer or different performance in pediatric populations | General Controls and special controls (1) (21 CFR 862.1355(b)(1)), (2) (21 CFR 862.1355(b)(2)), (3) (21 CFR 862.1355(b)(3)), (4) (21 CFR 862.1355(b)(4)), (5) (21 CFR 862.1355(b)(5)), (6) (21 CFR 862.1355(b)(6)), and (7) (21 CFR 862.1355(b)(7)). |
| The inability to make appropriate treatment decisions when glucose values are unavailable due to sensor signal dropout or loss of communication with digitally connected devices | General Controls and special controls (1)(vii) (21 CFR 862.1355(b)(1)(vii)), (2) (21 CFR 862.1355(b)(2)), (3) (21 CFR 862.1355(b)(3)), (6) (21 CFR 862.1355(b)(6)), and (7) (21 CFR 862.1355(b)(7)). |
| Patient harm due to insecure transmission of data | General Controls and special control (2) (21 CFR 862.1355(b)(2)). |
| Use of an iCGM as part of another digitally connected medical device system, such as an automated insulin dosing (AID) system, when the iCGM has inadequate analytical or clinical performance to support the intended use of the digitally connected device | General Controls and special controls (2) (21 CFR 862.1355(b)(2)), (6) (21 CFR 862.1355(b)(6)), and (7) (21 CFR 862.1355(b)(7)). |

87 Fed. Reg. at 9238. The controls are codified at 21 C.F.R. § 862.1355, "Integrated Continuous Glucose Monitoring System" (abbreviated "iCGM"). The first identified risk involves "[c]linical action based on falsely high or falsely low glucose values." *Id.* The responsive controls include several aspects of design verification and validation, such as requiring "a detailed strategy to ensure secure and reliable means of iCGM data transmission to provide real-time glucose readings at clinically meaningful time intervals to devices intended to receive the iCGM glucose data" and laying out several performance requirements for clinical studies of the device. *Id.* at § 862.1355(b)(1)(v), (b)(2). As to labels, the following special control applies:

The labeling required under § 809.10(b) of this chapter must include a separate description of the following sensor performance data observed in the clinical study performed in conformance with paragraph (b)(1) of this

section for each intended use population, in addition to separate sensor performance data for each different iCGM insertion or use sites (e.g., abdomen, arm, buttock):

> (i) A description of the accuracy in the following blood glucose concentration ranges: less than 54 mg/dL, 54 mg/dL to less than 70 mg/dL, 70 to 180 mg/dL, greater than 180 to 250 mg/dL, and greater than 250 mg/dL.
> (ii) A description of the accuracy of positive and negative rate of change data.
> (iii) A description of the frequency and duration of gaps in sensor data.
> (iv) A description of the true, false, missed, and correct alert rates and a description of the available glucose concentration alert settings, if applicable.
> (v) A description of the observed duration of iCGM life for the device.

*Id.* at § 862.1355(b)(7). The requirements incorporated from 21 C.F.R. § 809.10(b), "Labeling for In Vitro Diagnostic Products," further provide several warnings and instructions that must be included on the device label and inserts in the order described, where applicable. "In order for a device to fall within [class II de novo] classification, and thus avoid automatic classification in class III, it would have to comply with the special controls named in this final order." 87 Fed. Reg. at 9238. Based on the above, the court can readily find that the special controls established under 21 C.F.R. § 862.1355 are device-specific label and design requirements of the FDA on which the G6's Class II de novo classification and approval depended. They therefore satisfy the first prong of the preemption test.

Under the second prong, the court must determine whether the claims are based on state law requirements that are "different from, or in addition to the federal ones" and relate to the device's safety and efficacy. *Riegel*, 552 U.S. at 322. To recap, plaintiff has raised claims of design defect, failure to warn, and breach of express warranty under the LPLA.

Plaintiff makes no allegation of mismanufacture or that defendant failed to comply with the FDA regulations. Instead, her claims under the LPLA attack both the safety of the product's design and the adequacy of its label notwithstanding the FDA's approval. These claims impose requirements "in addition to" those made by the FDA and are therefore preempted. *In re Medtronic, Inc., Sprint Fidelis Leads Prods. Liab. Litig.*, 623 F.3d 1200, 1208 (8th Cir. 2010).

As to the failure to warn claim, allowing a jury to second-guess the adequacy of materials approved by the FDA under state law "would displace the FDA's exclusive role and expertise in this area and risk imposing inconsistent obligations on [the defendant]." *Gomez v. St. Jude Medical Diag. Div., Inc.*, 442 F.3d 919, 931 (5th Cir. 2006). Plaintiff argues, however, that the label could have been changed under the FDA's Changes Being Effected ("CBE") regulations to reflect newly acquired information on the risk of harm. Generally speaking, a manufacturer can only change a drug label if the FDA approves a supplemental application. *Wyeth v. Levine*, 555 U.S. 555, 568 (2009). A manufacturer may also unilaterally alter the label under the CBE regulation, if the changes "add or strengthen a contraindication, warning, precaution, or adverse reaction" in order to "reflect newly acquired information." 21 C.F.R. § 314.70(c)(6)(iii). "Newly acquired information" is that which "reveal[s] risks of a different type or greater severity or frequency than previously included in submissions" to the FDA. 21 C.F.R. § 314.3(b). It includes both new data and new analyses of submitted data. *Gibbons v. Bristol-Myers Squibb Co.*, 919 F.3d 699, 707 (2d Cir. 2019).

Defendant asserts, and plaintiff does not refute, that the CBE regulation, 21 C.F.R. § 814.39(d)(2), is only applicable to manufacturers of Class III devices. The preemption exception here requires "clear evidence that FDA would not have approved a change to the drug's label [to preempt] a claim, grounded in state law, that a drug manufacturer failed to warn consumers of the change-related risks associated with using the drug." *Merck Sharp & Dohme Corp. v. Albrecht*, ––– U.S. ––––, 139 S.Ct. 1668, 1672, 203 L.Ed.2d 822 (2019) (quoting *Wyeth*, 555 U.S. at 571). Given the greater similarities between Class II *de novo* and Class III premarket approval, the court assumes for the sake of argument that there might have been some way for defendant to bring any significant post-approval information to the FDA's attention that would have triggered a change in its labeling requirements.

In the First Amended Complaint plaintiff stated:

> Defendant had a continuing duty to provide consumers, including Plaintiff and Plaintiff's physicians, with warnings and other clinically relevant information and data regarding the risks and dangers associated with the Dexcom G6 System, such as newly acquired information about accuracy rates, adverse events and product malfunctions, as it became or could have become available to Defendants.

Doc. 16, ¶ 210. The only other reference to such information is an allegation that reported injuries have "skyrocketed" since the device's 2018 approval, from 226 in 2018 to 1548 in 2020 to 2822 in 2023. *Id.* at ¶¶ 31–32. Even reading the allegations in a light most favorable to plaintiff, these claims only show that reported injuries increased after the device came on to the market. Courts have rejected the notion that analyses based on adverse event reports, much less the reports standing alone, can constitute "newly acquired information."

*Gayle v. Pfizer Inc.*, 452 F.Supp.3d 78, 88 (S.D.N.Y. 2020) (collecting cases). Plaintiff's allegations do not indicate the mechanism of injuries, much less show that they were of a different type or greater severity than the risks previously reported to the FDA. Plaintiff will be given leave to amend on her failure to warn claim, but should be prepared to support it with references to specific studies. Otherwise, her claims under the LPLA are preempted.

## III.
## CONCLUSION

For the reasons stated above, the Motion to Compel Arbitration [doc. 19] will be **DENIED** and the Motion to Dismiss [*id.*] will be **GRANTED IN PART** and **DENIED IN PART**, with all plaintiff's claims dismissed except her failure to warn claim under the LPLA. Plaintiff will be given **28 days** to amend her complaint as to that claim alone and address the deficiencies described above to show that it is not preempted based on the exception for "newly acquired information." Defendant may then file another motion to dismiss, and the court will address its remaining arguments (such as misuse) if it finds that the claim is not preempted.

**THUS DONE AND SIGNED** in Chambers on the 15th day of July, 2024.

**JAMES D. CAIN, JR.**
**UNITED STATES DISTRICT JUDGE**